AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

ISAAC AARON MORGAN LOFTUS,

Defendant

Case No. 2:23-mj-00283-DUTY

LODGED
CLERK, U.S. DISTRICT COURT
1/23/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
Jan. 23, 2023
CENTRAL DISTRICT OF CALIFORNIA
BY: IV DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 22, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(o) | Possession of a Machinegun |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Geoffrey Colvin
Complainant's signature

Geoffrey Colvin, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 23, 2023

*Patricia Donahue*
Judge's signature

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
Printed name and title

AUSA: Kathrynne Seiden (x0631)

**AFFIDAVIT**

I, Geoffrey Colvin, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrant for Isaac Aaron Morgan LOFTUS "LOFTUS" for a violation of 18 U.S.C. § 922(o) (possession of a machinegun).

2.  This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Los Angeles Police Department ("LAPD"), in Los Angeles, California, as described more fully in Attachment A:

    a.  ASUS VivoBook Laptop Computer, Unknown/ non-visible serial and model numbers ("SUBJECT DEVICE 1");

    b.  "logi" USB storage drive inserted in ASUS Laptop, Unknown serial and model numbers ("SUBJECT DEVICE 2"); and

    c.  Broken USB storage drive inserted in ASUS Laptop, Unknown serial and model numbers ("SUBJECT DEVICE 3").

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(o) (possession of a machinegun); 18 U.S.C. § 922(g)(4) (prohibited person in possession of firearms and ammunition); 26 U.S.C. § 5861(d) (possession of unregistered firearms); and 18 U.S.C. § 924(h) (knowing receipt of a firearm for use in the commission of a felony) (the "Subject Offenses"),

as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") in Los Angeles, California and have been so employed since August 2022.  I attended 18 weeks of New Agent Training at the FBI Academy in Quantico, Virginia.  I am currently assigned to a counter-terrorism squad, where I specialize in domestic terrorism investigations.  Prior to joining the FBI, I worked as an analytical chemist in the pharmaceutical and alcohol industries for six years.  As an FBI Special Agent, I have participated in investigations regarding domestic terrorism, riots, and civil disturbances.  Through my training and experience, I have learned and used a variety of investigative techniques and resources, including surveillance, subpoenas, search warrants, evidence seizures, and analysis of telephone and other digital records.  As an FBI Special Agent, I

have participated in the execution of search warrants, including search warrants on digital devices.

### III. SUMMARY OF PROBABLE CAUSE

6. LOFTUS has been prohibited from possessing firearms as a result of having been declared a danger to himself and others. On November 22, 2022, LOFTUS possessed on his person a loaded 9mm handgun lacking a serial number, multiple knives, a tactical vest, and heavy duty zip ties.

7. That same day, LOFTUS also possessed another loaded 9mm handgun in the glove compartment of a car he was driving, which he stole from a dealership the previous day and subsequently used in a hit-and-run. In a toolbox in the trunk of the car, LOFTUS possessed a short-barreled AR-style rifle, a silencer, dozens of rounds of live ammunition, and a drop-in auto sear designed for converting a semiautomatic firearm into a fully automatic machinegun.

8. In his bedroom, LOFTUS possessed dozens of additional auto sears, Glock switches (also designed for converting semiautomatic firearms into fully automatic ones), additional ammunition, and additional firearm receivers.

9. LOFTUS told the officers who arrested him they would be dead if they continued to question him. After he was arrested and in custody, LOFTUS spontaneously told officers that "judgment day has been delayed."

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. LOFTUS Brandishes a Loaded Ghost Gun at Passing Vehicles Near a High School

11. On November 22, 2022, at approximately 12:21 p.m., the LAPD received a call that an individual in the vicinity of Thomas Jefferson High School in Los Angeles, wearing a security vest and cargo pants, had a gun. LAPD Officers Gutierrez and Wang responded and approached LOTFUS, who was wearing tactical gear and cargo pants. LOFTUS refused the officers' multiple commands to stop, attempted to walk away, and hopped a fence before stopping and complying with the officers' requests.

12. LAPD Officers Romero and Sanchez interviewed a witness who stated that he had seen LOFTUS point a firearm at two moving vehicles with occupants.

13. Officers Gutierrez and Wang, assisted by LAPD Officers Galvan and Oregel, handcuffed LOFTUS and asked him for his identifying information. LOFTUS identified himself as "Yahweh" (Hebrew for God) and said that the officers would be dead if they continued to question him. The officers observed fresh injuries to LOFTUS's knuckles and hands.

14. The officers removed a 9mm handgun with no serial number, containing one round in the chamber and six rounds in the magazine, from a holster on LOFTUS's front right hip area. The holster had a picture of an Igloo and two stripes of

Hawaiian styled flowering, both symbols associated with the Boogaloo movement.[1]

15. Also on LOFTUS's person, the officers recovered two heavy duty zip ties, a tactical plate carrier, a pocket knife with a three-inch blade, a black knife with a four-inch fixed blade, and two vehicle key fobs for a Honda with a VIN ending in -003769.

### B. LOFTUS Possessed Additional Firearms and Ammunition in a Car He Stole, Crashed, and Abandoned

16. Based on a database check, Officer Vigil determined that the VIN ending in -003769 belongs to a black four-door Honda Clarity which had been reported stolen from a CarGurus car dealership the previous day. Officer Wang also learned that on November 22, 2022, the Honda had been involved in a hit and run, abandoned approximately five blocks away from where the officers later arrested LOFTUS, and towed.

17. Detectives Quan and Grey obtained consent to search the Honda Clarity from Frank Hazem, an agent at CarGurus (the

---

[1] Based on my training and experience, I know that some domestic violent extremists use the term "boogaloo" to refer to a violent uprising or impending civil war. The concept has resonated with militia violent extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights -- including the Second Amendment -- or other perceived government overreach. Some racially or ethnically motivated violent extremists have used the term to reference an impending race war – or other conflict that will lead to the collapse of the "system," including the US government, society, etc. Extremists may allude to the boogaloo concept using shorthand terms such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The boogaloo is not a single cohesive group, but rather a loose concept arising from internet platforms which has become a rallying point for some violent extremists.

rental company that owns the Honda). The detectives found a loaded 9mm handgun lacking a serial number in the glove compartment. In the trunk of the Honda, the detectives found a toolbox containing the upper and lower receiver of a nearly 12-inch AR-style rifle, a drop-in auto sear, dozens of rounds of various calibers of ammunition, approximately 23 magazines, and a silencer.

        **C.    LOFTUS Admits to Possessing the Gun and to Having Crashed the Stolen Car**

    18.    Detective Allen interviewed LOFTUS. After listening to and waiving his Miranda rights, LOFTUS made the following statements:

        a.    LOFTUS stated that he was "treated like shit by humanity," is "god," and is the "word of god." He further stated that he owns everything, owns all families, and can take "it" back whenever he pleases.

        b.    When asked about the gun he had on him when arrested, LOFTUS stated "that's my shit." He also stated: "See these hands, I built shit" and "I piece things together perfectly."

        c.    LOFTUS admitted to having been involved in a traffic collision before his arrest because he believed he was being chased. LOFTUS stated that the keys he had on him were the keys for the car he was driving when he got into the accident. LOFTUS claimed he was chased by officers for thirty days over hundreds of miles. He also stated the property in the

car was his to possess because he owns the dealership and everything is his.

       d.    LOFTUS said he took "his" car because he needed to complete what he was set out to do and to finish the job himself.

19. LAPD Officers subsequently transported LOFTUS to Metropolitan Detention Center for booking. While sitting outside of the jail dispensary, LOFTUS spontaneously stated "judgment day has been delayed."

    **D.    Law Enforcement Finds Additional Firearms and Machineguns in LOFTUS's Bedroom**

20. Detectives Allen and Gutierrez contacted LOFTUS's mother, who provided LOFTUS's home address in Pasadena, California. Detectives Allen and Gutierrez spoke with the property owner at LOFTUS's home address, who confirmed that LOFTUS rents a bedroom in the residence. The property owner allowed the detectives to look inside the bedroom.

21. Detectives Allen and Gutierrez saw firearms and firearm cases in plain view. The detectives also saw in plain view a large American flag with Hawaiian print and igloo symbols consistent with Boogaloo ideology.

22. The detectives exited the bedroom, secured the location, and waited for a search warrant to be approved. The Honorable C.J. Pratt, Judge of the Superior Court of California, County of Los Angeles, authorized a search warrant for the residence.

23. Officers then searched LOFTUS's bedroom and recovered, among other items, the following: approximately 44 drop-in auto sears; approximately 12 Glock switches and additional switch parts; a threaded barrel; live ammunition; several lower receivers; and a Polymer80 kit.

24. Officers also located the SUBJECT DEVICES in LOFTUS's bedroom.

**E.   Loftus is Prohibited From Possessing Firearms**

25. Based on records from the California Department of Justice Bureau of Firearms, I am aware of the following.

   a.   In December of 2016, LOFTUS was placed on a mental health hold under California Welfare Institutions Code ("WIC") Section 5250 and was deemed a danger to himself or others or gravely disabled.  LOFTUS incurred a lifetime prohibition on firearms as a result.

   b.   In November of 2022, LOFTUS was placed on a 72-hour hold under WIC Section 5150 and was deemed a danger to himself or others.

26. On November 29, 2022, Special Agent Ahonen and Detective Farias interviewed a family member and learned the following.

   a.   As a child, LOFTUS was diagnosed as bipolar and was prescribed medication.  Roughly one year ago, a new doctor re-diagnosed LOFTUS as high functioning autistic and discontinued his medication.  He seemed to be doing fine until recently.

    b. LOFTUS has a history of drug use and erratic and manipulative behavior. After he received a 5150 designation, he convinced the doctor he should be released. LOFTUS has always been paranoid but recently delved into conspiracy theories.

    c. The family member knew LOFTUS had at least two guns locked in a tool chest in his home. LOFTUS would discuss building assault rifles and frequently talked about the "dark web." The family member asked LOFTUs if he would surrender his guns to the police, but LOFTUS said the guns were illegal and he would get in trouble if the police saw them.

    d. LOFTUS told the family member if he was going to "go out," it was going to be by "death by cop."

  **F.** **Firearm Analysis**

  27. On November 23, 2022, LAPD Detective Jones, a firearms expert with training from the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), inspected the firearms and firearm parts recovered from LOFTUS's person, the Honda, and LOFTUS's bedroom. Detective Jones observed that the upper receiver of the AR-style rifle found in the Honda had a barrel length of approximately 12 inches. Detective Jones also analyzed the Glock switches and auto sears found in LOFTUS's bedroom. Detective Jones concluded that the auto sears and switches were capable of, and had the sole function and design of, converting semi-automatic firearms into machineguns. Finally, Detective Jones concluded that the silencer found in the Honda had the characteristics of a suppressor and thus qualified as a device intended for use in silencing, diminishing, or muffling the report of a firearm.

28. On December 23, 2022, ATF Special Agent Liwinski conducted a visual examination of the Glock switches and drop-in auto sears recovered from the Honda and from LOFTUS's bedroom.

29. SA Liwinski has been a special agent with the ATF since 2008 and primarily investigates firearms violations. SA Liwinski has inspected hundreds of firearms in investigations regarding machineguns and machinegun conversion devices.

30. SA Liwinski observed that the Glock switches and drop-in auto sears appear to be designed to alter the function of a semi-automatic firearm and render it a fully automatic machinegun. Thus, based on the visual examination, SA Liwinski believed that the switches and auto sears qualify as machineguns within the definition of 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b). SA Liwinski also observed that the upper receiver of the AR-style rifle found in the Honda had a barrel of 11 and 5/8 inches, and thus qualified as a short-barreled rifle within the meaning of 26 U.S.C. § 5845(a). Finally, SA Liwinski observed baffles in the silencer which allowed the silencer to function as a device intended to silence, muffle, or diminish the report of a portable firearm, and thus qualified as a silencer within the definition of 18 U.S.C. § 921(a)(25).

## V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

31. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

32.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

33.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  34.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

36.  For all of the reasons described above, there is probable cause to believe that LOFTUS has committed a violation of 18 U.S.C. § 922(o) (possession of a machinegun).  There is

//
//
//
//
//
//

also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  23rd  day of
January, 2022

*Patricia Donahue*
_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

15